THE PEOPLE *ex rel.* William H. Stead, Attorney General,
Relator, *vs.* HARRY M. PHIPPS, Respondent.

*Opinion filed February 21, 1914.*

1. DISBARMENT—*when improper conduct occurring many years
before filing information cannot be overlooked.* Improper conduct
by an attorney in making personal use of funds in his hands as
master in chancery, even though the money was restored by his
bondsman and the matter occurred many years before the filing of
an information to disbar him, cannot be overlooked where his sub-
sequent conduct has been unprofessional.

2. SAME—*what attempt to collect money is unprofessional.* An
attorney who writes a letter to a woman from whom he is trying
to collect a claim by suit, charging her with having made a false
affidavit for a continuance and threatening her with criminal prose-
cution unless she pays the claim, is guilty of unprofessional conduct.

3. SAME—*when attorney is guilty of reprehensible conduct as
State's attorney.* An attorney who, while acting as State's attor-
ney, urges young boys to plead guilty to a charge of which they
protested their innocence, and who takes them into court and has
them sign a waiver of jury trial and enter a plea of guilty, which
it appears from their conversation with the judge immediately
thereafter that they do not intend to do and did not know they had
done, is guilty of reprehensible conduct even though he may have
believed he could prove them guilty.

4. SAME—*when motives actuating disbarment proceeding can
not affect decision.* The fact that the relations between the re-
spondent and those instigating and aiding the prosecution of the
information to disbar have long been unfriendly cannot affect the
decision of the case, where the facts alleged in the information
are proved.

5. The court holds, under the evidence in this case, that the
respondent has been guilty of such unprofessional conduct as to
require his suspension from practice as an attorney for a period
of one year and until thereafter permitted to resume practice by an
order of the court.

ORIGINAL information to disbar.

P. J. LUCEY, Attorney General, (D. B. SNOW, of coun-
sel,) for relator.

NOLEMAN & SMITH, for respondent.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The Attorney General filed in this court an information charging the respondent, Harry M. Phipps, with conduct rendering him an improper person to continue the practice of law under the license of this court and praying the court to strike his name from the roll of attorneys. The information was answered, and the issues formed were referred to W. Edgar Sampson as a commissioner to take and report to the court the evidence of the parties, together with his conclusions. The information contained a number of charges concerning which evidence was introduced, and the commissioner reported that the charges numbered 1, 6 and 10 were proved and that the charges numbered 2, 3 and 5 were not proved. In his opinion the charge numbered 1 ought to be regarded as barred by the lapse of time, but he recommended that the respondent should be suspended from practice for a period of three months. Each party excepted to the findings of fact by the commissioner, and the cause was submitted upon abstracts, briefs and both printed and oral arguments.

The first charge is that the respondent, while master in chancery of the circuit court of Wabash county, appropriated in transactions on a board of trade, by means of what he called the Cash Market Company, something over $3000 which he had received and then held as master in chancery. The fact was not denied and the circumstances proved were as follows: The respondent and his step-father, Henry M. Mundy, were practicing law under the style of Mundy & Phipps and the respondent was master in chancery. The respondent, under an arrangement with his partner, partitioned off a part of the office room and opened a place for trading on a board of trade under the name Cash Market Company. There were losses in the business and the partner advanced $1284 to meet such losses, and when further losses occurred the respondent took and used the money

261 — 37

mentioned in the information which was in his hands as master in chancery. The only excuse offered by the respondent was that the money was used with the consent of his partner, who was one of his sureties and who made good the amount by payment to the respondent's successor in office. The partner denied that he authorized the use of the money held in trust; but whatever the fact may be, any consent of the partner, who was the respondent's step-father, would not change the nature of the transaction. This was in 1903, and if the matter had been brought to the attention of this court at that time, or soon after, a disbarment would have been inevitable. The proceeding based upon that charge is not now barred by any statute of limitations or limitation established by the court, (*People* v. *Hooper,* 218 Ill. 313; 4 Cyc. 915;) but if no other unprofessional or disreputable conduct afterward had been proved we would not regard what the respondent did at that time as justifying disbarment or discipline. Such an act, however, cannot be overlooked or disregarded in view of subsequent acts which were proved.

The sixth charge is based upon a letter written by the respondent in 1906 to Nancy J. Andrews. She lived at Evansville, Indiana, and had given a warranty deed of property to Reuben Reed, who afterward paid an assessment against the property and brought suit against her to recover the amount paid. On appeal to the circuit court a continuance was granted on the application of her attorney on account of her illness. The respondent, who was attorney for Reed, wrote the letter to Mrs. Andrews charging her with making a false affidavit for the continuance, which was a ground for a criminal prosecution, and threatened her with such prosecution unless she paid the amount of the assessment, saying that he would not allow a client of his to be defeated and justice throttled by such trickery without the offender paid for the same according to the statute. It appears that there was no affidavit made by

Mrs. Andrews but the case was continued on the certificate of a physician and perhaps an affidavit of her attorney. But whether Mrs. Andrews made any affidavit or not, and however respondent may have regarded his client's claim, the attempt to compel a settlement of the suit by the method adopted was unjustifiable.

Charge No. 10 was based on the following facts: The respondent was elected State's attorney of Wabash county in 1908. Complaint was made to him that Goldie and Harry Petty, children ten and twelve years old, respectively, and Frank Brines, aged fourteen, had taken an evergreen tree from a cemetery lot in Mt. Carmel. An evergreen tree had been cut from the cemetery lot of James Beanblossom, and these boys had sold a tree at Russell's grocery store which was believed to be the same. The respondent filed an information in the county court against the children and had them arrested. Leroy Petty, the father of the Petty children, became surety for the appearance of the children and the respondent advised the father to have the boys plead guilty. The father objected, but the respondent told him that that was the easiest and cheapest way out; that the fine would be nominal, and the defendants being young boys, the court would not send them to jail. The respondent also urged the children to plead guilty, but they protested that they did not take the evergreen tree from the lot and told him where they obtained it. They never admitted their guilt, but he went with them to the court and prepared formal waivers of trial by jury and a confession of guilt, which the children signed. The paper was handed to the judge, who entered judgment thereon, with a fine and order that the boys be committed to jail until the fine and costs were paid. The judge then talked to the boys about their offense and asked them why they committed it, when Frank Brines replied that they did not take the tree but got their tree on Keyes Hill. The judge asked them why they pleaded guilty when they were not, and they said

they never pleaded guilty and always said they were not guilty. The judge set aside the judgment and appointed an attorney to inquire into the case. The respondent was acting as State's attorney for the People, and his conduct in urging the plea of guilty and having the boys sign such a plea while they protested their innocence was most reprehensible and not justified because he believed he could prove them guilty.

The exceptions of the respondent to the findings of fact by the commissioner are overruled.

The second charge of the information was, that the respondent, as State's attorney, filed an information against George W. Morris, known as Rowdy Morris, for the illegal sale of intoxicating liquor; that James E. Inskeep and Richard Utter were sureties for Morris for his appearance in court, and that the respondent proposed to them that if they would give him $108, or a promissory note for that amount, he would withdraw the information from the files and destroy it or put it where they could get it and destroy it. The evidence to sustain this charge consisted of the testimony of James E. Inskeep and Richard Utter, who testified that the proposal was made and that the respondent told them if they did not get off of Morris' bond Morris would not be there at the time and they would have the bond to pay, because he was going to have Morris taken by the Federal authorities to Danville and when the case was called in July he would not be in court. There was evidence tending to weaken the testimony of these witnesses by members of the grand jury, who testified that when the witnesses appeared before the grand jury and stated the proposition they said that the amount demanded was $150. The respondent denied that he made the proposition, and the witnesses at first fixed the time in November, 1908, and after examining the record placed it in February, 1909. James E. Inskeep was a physician who had practiced in Mt. Carmel for twenty-three years, had

been coroner of the county for two terms and chairman of the democratic county committee for fourteen years, and Utter was a real estate agent who had lived in Mt. Carmel twenty or twenty-five years. It seems most improbable that such a story as they related could be manufactured without any basis whatever, and it seems quite evident that some proposition of a disreputable character was made to the bondsmen.

The third charge was, that the respondent had corruptly proposed to Alonzo Glick that the respondent would release Guy Glick, brother of Alonzo, from a charge of burglary which had been preferred against him, if Alonzo would pay the respondent $200 or their mother would raise that amount by mortgaging her home. Guy Glick had been employed to make some repairs on a launch and found it necessary to break open a tool-box, from which he took a target pistol and took the pistol home. A son of the owner filed a complaint, but when the owner came back there was an explanation and it appeared that Guy Glick was not guilty of any crime. Alonzo Glick testified that respondent made the proposition but respondent denied it, and as there was no corroboration of Alonzo we think the commissioner was justified in regarding the charge as not proved.

Charge No. 5 is, that the respondent proposed to Elmer Linxwiler to give him $10 if he would swear that Rowdy Morris sold him intoxicating liquor, whether it was true or not. Linxwiler was not corroborated, and we think the commissioner was justified in that finding.

The exception of the relator to the finding respecting charge No. 2 is sustained and the exceptions to the findings concerning charges 3 and 5 are overruled.

It was shown by the evidence that at the time of the filing of the information there was unfriendly feeling between those who instigated and aided the prosecution and the respondent, but the facts being proved, the motives or feelings of those who caused the information to be filed

cannot affect our conclusion. It is a matter of common knowledge that unless there is some organization pledged to maintain the standards of professional integrity among attorneys and so numerous and of such a character as to be free from the consequences of the enmity of anyone who may be prosecuted, there is much hesitancy on the part of attorneys to institute a prosecution and incur such enmity solely for the public good.

The commissioner recommended a suspension for only three months, but we cannot approve that recommendation. The respondent is suspended from practice as an attorney for a period of one year and until thereafter permitted to resume practice by order of this court.

*Respondent suspended.*